**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PUREPECHA ENTERPRISES, INC., an Illinois Corporation, d/b/a EL MATADOR, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| EL MATADOR SPICES & DRY CHILES, a California Corporation, EL MATADOR ADOBOS, LLC, a Texas limited liability company, CARLOS RICO, JAIME PABLO RICO, DARIO RICO, ROGELIO RICO, ARTURO OROZCO, RUBEN OROZCO, and ISRAEL GONZALES FERNANDEZ, | ) ) ) ) ) ) ) ) | Case No. 11 C 2569 |
| Defendants. | ) ) | |
| _____ | ) ) | |
| EL MATADOR ADOBOS, LLC and CARLOS RICO, | ) ) ) | |
| Counter-Plaintiffs, | ) ) | |
| v. | ) ) | |
| PUREPECHA ENTERPRISES, INC., EVERARDO MEJIA, and PETRA ANGELICA RICO, | ) ) ) ) | |
| Counter-Defendants. | ) ) | |
| _____ | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On April 15, 2011, Plaintiff Purepecha Enterprises, Inc., d/b/a El Matador ("Plaintiff"),

filed an eight-count Complaint alleging trademark claims under the Lanham Act, 15 U.S.C. §

1051, *et seq*., as well as state law claims against Defendants El Matador Spices & Dry Chiles, El

Matador Adobos, LLC, and certain individuals ("Defendants").  *See* 28 U.S.C. §§ 1331, 1367(a).

On June 30, 2011, Defendants El Matador Adobos, LLC ("El Matador Adobos") and Carlos

Rico ("Counter-Plaintiffs") filed a thirty-count Counterclaim against Purepecha Enterprises, Inc.,

Everardo Mejia, and Petra Angelica Rico ("Counter-Defendants") alleging Lanham Act

trademark violations, *see* 15 U.S.C. § 1051, *et seq*., as well as state law claims.

As discussed in detail below, the parties have filed cross-motions for summary judgment

pursuant to Federal Rule of Civil Procedure 56(a).  For the following reasons, the Court grants in

part and denies in part Defendants'/Counter-Plaintiffs' motion for summary judgment and grants

in part and denies in part Plaintiff's/Counter-Defendants' motion for partial summary judgment.

In addition, the Court grants in part and denies in part Defendants'/Counter-Plaintiffs' motion to

strike.

## INTRODUCTION

## I.      Claims and Counterclaims

In its eight-count Complaint, Plaintiff alleges the following claims: (1) a Lanham Act

direct infringement claim pursuant to 15 U.S.C. § 1114 (Count I); (2) a Lanham Act unfair

competition claim based on 15 U.S.C. § 1125, as well as common law unfair competition claims

under Illinois, Texas, Michigan, Indiana, Missouri, and Ohio law (Count II); (3) a Lanham Act

trademark dilution claim under 15 U.S.C. § 1125(c) (Count III); (4) an Illinois Uniform

Deceptive Trade Practices Act ("IUDTPA") claim under 815 ILCS 510/2 (Count IV); (5) three

Illinois common law tortious interference with contract claims (Counts V-VII); and (6) an

Illinois Consumer Fraud and Deceptive Business Practices Act claim ("ICFA") pursuant to 815

ILCS 505/2 (Count VIII).

Counter-Plaintiffs El Matador Adobos and Carlos Rico bring the following thirty counts in their Counterclaim: (1) a Lanham Act trademark infringement claim pursuant to 15 U.S.C. § 1125(a) (Counterclaim I); (2) a Lanham Act false advertising claim under 15 U.S.C. § 1125(a) (Counterclaim II); (3) an IUDTPA claim (Counterclaim III); (4) an ICFA claim (Counterclaim IV); (5) a claim to cancel U.S. Trademark Registration No. 3,942,992 based on fraud (Counterclaim V); (6) a claim to cancel U.S. Trademark Registration No. 3,942,992 pursuant to 15 U.S.C. § 1052(d) (Counterclaim VI); (7) a claim to cancel U.S. Trademark Registration No. 3,436,830 based on abandonment (Counterclaim VII); (8) a claim for declaratory relief concerning ownership of the trademarks at issue (Counterclaim VIII); (9) an Illinois common law defamation *per se* claim (Counterclaim IX); (10) an Illinois common law defamation *per quod* claim (Counterclaim X); (11) a Texas common law breach of fiduciary duty claim (Counterclaim XI); and (12) nineteen Illinois common law tortious interference with contract claims (Counterclaims XII-XXX).

## II.    Motions for Summary Judgment

Before the Court are Defendants'/Counter-Plaintiffs' (collectively "El Matador") motion for summary judgment and Plaintiff's/Counter-Defendants' (collectively "Purepecha") motion for partial summary judgment. Purepecha moves for summary judgment as to Counterclaims I, III, IV, V, VII, and IX-XXX. El Matador moves for summary judgment as to all eight counts of Purepecha's Complaint, as well as Counterclaims V, VI, and VII in which El Matador seeks cancellation of Purepecha's U.S. Trademark Registrations. For the following reasons, the Court grants in part and denies in part El Matador's summary judgment motion and grants in part and denies in part Purepecha's partial summary judgment motion. The Court dismisses – with

prejudice – Counts V-VII of the Complaint and Counterclaims XI-XIX and XXII-XXX from this lawsuit.

More specifically, the Court denies El Matador's summary judgment motion as to Purepecha's infringement claim in Count I of the Complaint. Furthermore, the Court denies El Matador's motion on Count II in which Purepecha alleges an unfair competition claim under both 15 U.S.C. § 1125(a) and common law because El Matador fails to make any arguments in support of its motion as to this claim. Likewise, although El Matador moved for summary judgment as to Purpecha's trademark dilution claim under 15 U.S.C. § 1125(c) in Count III, neither party addresses this claim, including whether the marks at issue are "truly prominent and renowned" as required by the statute. *See Ty Inc. v. Perryman,* 306 F.3d 509, 511 (7th Cir. 2002). As such, the Court denies El Matador's summary judgment motion as to Count III. The Court also denies El Matador's motion as to Purepecha's IUDTPA and ICFA claims alleged in Counts IV and VIII. The Court grants El Matador's summary judgment motion as to Purepecha's tortious interference of contract claims in Counts V, VI, and VII and dismisses these claims from this lawsuit.

Further, the Court denies El Matador's and Purepecha's summary judgment motions as to El Matador's Counterclaim V for cancellation of U.S. Trademark Registration No. 3,942,992 based on fraud and El Matador's motion as to Counterclaim VI for cancellation of U.S. Trademark Registration No. 3,942,992 based on 15 U.S.C. § 1052(d). Similarly, the Court denies both El Matador's and Purepecha's motions concerning Counterclaim VII for cancellation of U.S. Trademark Registration No. 3,436,830 based on abandonment.

4

Because El Matador does not oppose Purpecha's motion as to El Matador's tortious interference with contract claims as alleged in Counterclaims XVII-IX and XXII-XXX, the Court dismisses these claims from this lawsuit. The Court grants Purepecha's motion as to El Matador's tortious interference with contract claims alleged in Counterclaims XII through XVI, but denies Purepecha's motion as to Counterclaims XX and XXI. The Court also denies Purepecha's motion as to El Matador's defamation Counterclaims IX and X, but grants Purpecha's motion as to El Matador's Texas common law breach of fiduciary duty claim against Counter-Defendant Everardo Mejia as alleged in Counterclaim XI. Last, the Court denies Purepecha's motion for partial summary judgment as to El Matador's ICFA and IUDTPA claims in Counterclaims III and IV.

## BACKGROUND

### I.     Northern District of Illinois Local Rule 56.1

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). Also, Local Rule 56.1(b)(3)(C) requires the nonmoving party

to present a separate statement of additional facts that requires the denial of summary judgment because the Court will not consider any additional facts proposed in the nonmoving party's Local Rule 56.1(b)(3)(B) Response. *See Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643-44 (7th Cir. 2008); *Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803, 809 (7th Cir. 2005).

As the Seventh Circuit recently explained, "[f]or litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment. The purpose of the local rule is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394, 398 (7th Cir. 2012). As such, Local Rule 56.1 statements should identify the relevant admissible evidence supporting the material facts, but should not make factual or legal arguments. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006) ("statement of material facts did [] not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"). Moreover, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.,* 233 F.3d 524, 528 (7th Cir. 2000). The Court may also disregard statements and responses that do not properly cite to the record. *See Cady,* 467 F.3d at 1060; *Cichon,* 401 F.3d at 809-10. Finally, the Court has broad discretion to enforce Local Rule 56.1. *See Benuzzi v. Board of Educ. of City of Chicago,* 647 F.3d 652, 655 (7th Cir. 2011).

## II.     Relevant Facts

### A.     The Rico Family Business

This lawsuit involves a dispute between siblings in the Rico family regarding pre-mixed seasonings called adobo that are used to marinade and season meat, including an adobo for a type of Mexican sausage called chorizo.  The father of the Rico siblings owned a butcher shop in Mexico and everyone in the Rico family worked at the family's butcher shop.  (R. 78-2, El Matador's Rule 56.1 Stmt. Facts ¶ 2.)  Carlos and Jesus Rico were the first siblings to make chorizo at the Rico family butcher shop in Mexico and, based on Carlos' suggestion, the Rico's father began using the El Matador name and bullfighter logo after Carlos had worked at a California butcher shop named El Matador.  (*Id*. ¶¶ 3, 5; R. 81, Purepecha's Rule 56.1 Stmt. Facts ¶ 6.)

Specifically, Carlos first worked at a butcher shop named El Matador in Santa Ana, California – which is in the greater Los Angeles area – for a short period of time in 1989.  (El M. Stmt. Facts ¶ 8.)  When Carlos permanently moved to the United States in 1995, he worked at the El Matador butcher shop from 1996 until approximately 1998 when the butcher shop closed.  (*Id*. ¶¶ 7, 8.)  While working at El Matador in Santa Ana, Carlos made chorizo and used a spice mix recipe that he had adapted from his father's adobo recipe.  (*Id*. ¶¶ 9, 10.)  This adobo could be stored and added in a measured quantity to meat to prepare chorizo.  (*Id*. ¶ 10.)

In 1996, Carlos decided to make his own chorizo adobo to sell to Hispanic and Latino grocery stores and butcher shops in the Los Angeles area.  (*Id*. ¶ 11.)  To start the business, Carlos sent money to his brother Jesus for raw spices and coloring from Mexico after which Jesus would ship these items to Carlos in the Los Angeles area.  (*Id*.)  Carlos then solicited

various butchers and owners of Hispanic and Latino grocery stores to buy the pre-made chorizo adobo from him by giving them free samples of the chorizo adobo. (*Id.* ¶¶ 12, 25.) Carlos sold the chorizo adobo wholesale to butchers and store owners in buckets that weighed approximately 40 pounds each. (*Id.* ¶¶ 14, 26.) To clarify, the stores bought the adobo mix to make chorizo – customers did not purchase the adobo directly. (*Id.* ¶ 66.) Meanwhile, the Santa Ana El Matador butcher shop's owner allowed Carlos to make the chorizo adobo at his butcher shop and to use the El Matador name and bullfighter logo. (*Id.* ¶ 13.)

### B. Early Use of the Marks

Carlos is the owner and president of El Matador Adobos, which is a limited liability company organized and existing under the laws of the State of Texas with its principal place of business in Rialto, California. (*Id.* ¶ 15; Purepecha's Stmt. Facts ¶ 1.) In 1996 – prior to the incorporation of El Matador Adobos – Carlos purchased business cards with the El Matador name and bullfighter logo (hereinafter "marks") and handed out these business cards to market the chorizo adobo to customers and potential customers. (El M. Stmt. Facts ¶¶ 16, 19, 21.) The business cards contained Carlos' contact information, the marks, and the words "Especies para Chorizo" meaning spices for chorizo. (*Id.* ¶¶ 19-21.)

In 1995 or 1996, Rafael Rico – Carlos' brother – immigrated to the United States from Mexico. (*Id.* ¶ 30.) Carlos, who was already living in the United States at that time, got Rafael a job at the El Matador butcher shop in Santa Ana. (*Id.*) Rafael also made and marketed the chorizo adobo with his brother Carlos – both of whom used the business cards with the El Matador and bullfighter marks on them in connection with the chorizo adobo. (*Id.* ¶ 32; R. 87, Purpecha Add'l Facts ¶ 50.) The parties dispute whether Carlos first used the business cards or

8

whether both Carlos and Rafael first used the business cards in relation to the adobo business. Also, the parties dispute whether the El Matador name and bullfighter marks were on the buckets of chorizo adobo or other business materials associated with the chorizo adobo when Carlos and Rafael worked together in the Los Angeles area starting in 1996, as discussed in detail below. (El M. Stmt. Facts ¶¶ 16, 21, 23.)

Meanwhile, in 1996, Dario Rico, another Rico brother, came to the United States and when Dario arrived both Carlos and Rafael were already using the business cards to sell the chorizo adobo. (*Id.* ¶¶ 33, 34.) In the summer of 1999, another brother, Rogelio, arrived in the United States and lived in the same house as Carlos at which time he assisted in preparing and delivering the chorizo adobo for Carlos. (*Id.* ¶ 36.)

### C.     Purepecha's Use of the Marks

Counter-Defendant Petra Angelica Rico – Carlos' sister – moved from Mexico to the United States in 1999, and her husband, Counter-Defendant Everado Mejia, moved to the United States, specifically Cicero, Illinois, in 1998. (Purepecha Stmt. Facts ¶ 6; El M. Stmt. Facts ¶ 52.) Mejia, the President of Purepecha, incorporated Purepecha on June 2, 2004 under the laws of the State of Illinois, and since then, Purepecha has been the corporate entity through which Mejia and Petra make and distribute their spices. (Purepecha Stmt. Facts ¶ 8; El M. Stmt. Facts ¶ 50.) In 1999, Petra and Mejia started selling chorizo adobo in the Chicago area using the El Matador and bullfighter marks that were identical to the marks Carlos and Rafael used. (El M. Stmt. Facts ¶¶ 53, 56.) It is undisputed that Petra and Mejia did not sell the chorizo adobo under the El Matador and bullfighter marks prior to May 1999. (*Id.* ¶¶ 53, 56.)

Since 2006, Rafael Rico has distributed Purepecha's products. (Purepecha's Stmt. Facts ¶¶ 14, 15.) At his deposition, Rafael testified that his business relationship with Mejia began in 2000 or 2001. (R. 78-5, Ex. C, Rafael Rico Dep., at 22, 26, 39.) Rafael further explained that he and Carlos worked together at El Matador in Santa Ana and made and sold adobo together. (Rafael Rico Dep., at 39-41; Purepecha Stmt. Facts ¶ 16.) In 1999, Rafael moved from California to Texas and started selling spice mixes there. (Purepecha Stmt. Facts ¶ 17.)

**D.      2005 Rico Family Business Plan**

In 2005, Carlos, Mejia, Petra, and several other Rico relatives agreed to enter into a business arrangement, the primary goal of which was to have only one entity that would produce spice mixes for distribution throughout the United States. (*Id*. ¶ 33.) One aspect of the business plan was that Mejia and Carlos would purchase a warehouse and machinery to mix the spices on an industrial scale. (*Id*. ¶ 34.) To accomplish the goals of the 2005 business plan, Mejia and Carlos formed a limited liability company, El Matador Adobos, LLC, on March 7, 2005. (*Id*. ¶ 35.) By early 2006, the family business arrangement had fallen through. (*Id*. ¶¶ 36, 37.)

**E.      Trademark Registrations**

Purepecha owns U.S. Trademark Registration No. 3,942,992 for the mark El Matador and bullfighter design with respect to "spices and seasonings." (*Id.* ¶ 9.) In particular, Purepecha applied for the registration on March 16, 2009, and the United States Patent and Trademark Office ("PTO") granted the application on April 12, 2011. (*Id*.) The March 16, 2009 trademark application contained the following representations: (1) Purepecha was the owner of the El Matador name and design mark; (2) Purepecha first used the trademark in 1999; (3) Purepecha first used the trademark in interstate commerce in 2000; and (4) "no other person, firm,

10

corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive." (R. 86, El M. Rule 56.1 Add'l Facts ¶ 52.)

Further, Purepecha owns U.S. Trademark Registration No. 3,436,830 for the mark Matador Brothers with respect to "marinades and spices." (Purepecha Stmt. Facts ¶ 11.) Purepecha applied for the Matador Brothers registration on November 8, 2006, and the PTO granted the application on May 27, 2008. (*Id*.) The Matador Brothers trademark application contained the following representations: (1) Purepecha was entitled to use the Matador Brothers mark in commerce; and (2) "no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive." (El M. Stmt. Add'l Facts ¶ 53.)

### F. Continued Use of the Marks

By 2008 and 2009, Purepecha was selling chorizo adobo in Arizona and California under the name El Gallo de Oro, while Carlos was selling chorizo adobo in Chicago under the marks at issue in this lawsuit. (El M. Stmt. Facts ¶ 60; Ex. B, Carlos Rico Dep., at 140.) In the spring of 2009, Carlos established a distributorship in the Chicago area – through family members Ruben Orozco, Arturo Orozco, and Jaime Rico – in response to Purepecha selling products under the El Gallo de Oro name in California. (Purepecha Stmt. Facts ¶ 19; Carlos Rico Dep., at 140-41.)

El Matador also contends that during this time period, Petra impersonated a health inspector and visited stores and butchers in the Chicago area that used Carlos' adobo during

which Petra disparaged Carlos' products. (El M. Stmt. Facts ¶ 61.) Purepecha, on the other hand, maintains that Petra visited stores in the Chicago area to gather information about Carlos' use of the marks. (R. 87, Purepecha Resp. ¶ 61.) The parties also dispute whether Petra made her niece, Yessica Orozco, call stores in the Las Vegas area and impersonate a health inspector to tell the store owners that Carlos' chorizo adobo was not up to health standards. (*Id*. ¶ 68.)

## III.     Motion to Strike

In conjunction with the pending summary judgment motions, El Matador has filed a motion to strike the declarations of Petra Rico, Rafael Rico, and Jose Dominguez. El Matador maintains that after the close of fact discovery, Purepecha submitted these three declarations in an attempt to create issues of fact so that Purpecha could survive summary judgment. El Matador does not point to the particular Local Rule 56.1 Statements to which these allegedly faulty averments pertain so that the Court can determine the statements' relevance within the context of the factual disputes at issue. *See Austin v. CUNA Mut. Ins. Soc'y,* 240 F.R.D. 420, 422 (W.D. Wis. 2006). Instead, El Matador specifically seeks to strike these declarations in their entirety, a remedy that is not warranted under the circumstances.[1]

In its motion, El Matador asserts that Rafael Rico's declaration contradicts his prior sworn testimony concerning the use of the marks at issue. It is well settled in this Circuit that

---

[1]  Because the Court does rely on any statements of fact that are based on Jose Dominguez's declaration, the Court denies El Matador's motion to strike Dominguez's declaration as moot. Likewise, the Court does not rely on the statements that El Matador argues are inadmissible hearsay, therefore, the Court also denies this aspect of El Matador's motion to strike as moot. *See Gunville v. Walker,* 583 F.3d 979, 985 (7th Cir. 2009) (a "party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."). Finally, El Matador's arguments attacking Petra's and Rafael's declarations based on their lack of English language skills and lack of authentication are baseless. (*See* R. 96, Bagley Decl., Exs. A & B.)

litigants cannot manufacture issues of fact by submitting declarations that contradict the substance of their prior sworn testimony. *See McCann v. Iroquois Mem. Hosp.,* 622 F.3d 745, 751 (7th Cir. 2010); *see also Ineichen v. Ameritech,* 410 F.3d 956, 963 (7th Cir. 2005) (litigants cannot "contradict deposition testimony with later-filed contradictory affidavits"). This rule "is designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised" and "applies when the change is incredible and unexplained." *McCann,* 622 F.3d at 750-51. To determine whether a later-filed declaration is a "sham," the Court "must examine the particular circumstances of a change in testimony to see whether it is plainly incredible or merely creates a credibility issue for the jury." *Patton v. MFS/Sun Life Fin. Distrib., Inc.,* 480 F.3d 478, 488 (7th Cir. 2007).

In its motion to strike, El Matador first takes issue with the differences between Rafael's deposition testimony and later-filed declaration concerning the use of the marks on the buckets of chorizo adobo during the time period of roughly 1996-99. More specifically, at his deposition, Rafael testified that he did not remember if Carlos ever wrote the name "Matador" on the buckets containing the chorizo adobo. In his declaration, however, Rafael avers that to the best of his knowledge, the buckets did not have the words "El Matador" on them.

Although some reasons for changes in testimony are plausible, including a lapse of memory or incomplete earlier testimony, *see Patton v. MFS/Sun Life Fin. Distrib.*, *Inc.,* 480 F.3d 478, 488 (7th Cir. 2007), the Seventh Circuit has held that a "party cannot claim a lack of general knowledge about a subject and later make a statement which requires detailed knowledge about the same subject." *Clark v. Takata Corp.,* 192 F.3d 750, 760 (7th Cir. 1999); *see also Unterreiner v. Volkswagen of Am., Inc.,* 8 F.3d 1206, 1211 (7th Cir. 1993) ("a party who

13

discounts his knowledge of a certain subject cannot create a 'genuine' issue of fact by contradicting unequivocal testimony about the subject"). Under this precedent, Rafael's specific averment that the chorizo buckets did not have the words "El Matador" on them contradicts his earlier deposition testimony that he did not have knowledge whether Carlos ever wrote the name "Matador" on the chorizo buckets. And, without a credible explanation for why Rafael later averred specific details concerning the use of the marks on the chorizo buckets, the Court grants El Matador's motion to strike in this respect.

Next, Rafael testified at his deposition that Carlos and he sold the chorizo adobo separately, whereas in his declaration he states that Carlos and he worked together, without formal roles, to do everything for the business. Rafael also averred that Carlos and he had their own customers. The differences between this deposition testimony and later averments are not "plainly incredible" or contradictory, but instead reveal that Rafael and Carlos had a business together, but also had their own individual customers. In fact, Carlos testified that Rafael had a few of his own customers while they were in business together. (Pl.'s Add'l Facts ¶ 50.) Because the differences are plausible, this change only affects Rafael's credibility and not the admissibility of the evidence. *See McCann,* 622 F.3d at 751; *Patton,* 480 F.3d at 488. Therefore, the Court will not strike this portion of Rafael's declaration.

El Matador also asserts that the Court should strike all three declarations because there is no foundation for the declarants' conclusory statements and the statements are not based on personal knowledge. To clarify, Rule 56(c)(4) requires that affidavits or declarations used to oppose summary judgment motions be made on personal knowledge. *See Jajeh v. County of Cook*, 678 F.3d 560, 567-68 (7th Cir. 2012). Therefore, conclusory or "self-serving affidavits

without factual support in the record will not defeat a motion for summary judgment." *Broaddus v. Shields,* 665 F.3d 846, 856 (7th Cir. 2011); *see also Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 812 (7th Cir. 2011). In its motion to strike, El Matador specifically argues that Rafael's declaration is "littered with conclusory statements and statements that are not based on his personal knowledge." The averments El Matador challenges – that are relevant to the parties' summary judgment motions – include:

- I was involved in the adobo business from the beginning, and Carlos and I worked together, without formal roles, to do everything that needed to be done for that business.

- We would make personal trips to seek out businesses that might want to buy the adobo to make their own chorizo and meats.

- Sometimes we would write a general term like "adobo" or "aderezo" or "adobo for chorizo" in marker on the buckets.

- We would use standard blank invoice forms.

- The name "El Matador" and the Bullfighter Logo did not appear on any other materials used with respect to our adobo business.

El Matador argues that these statements do not demonstrate personal knowledge because unless Rafael "is willing to swear on personal knowledge that he never left the side of Carlos year after year, he certainly could not, and should not, testify what 'never' occurred or what 'did not appear on any other materials.'" Although this may be true to some extent, El Matador's motion to strike does little more than nitpick Rafael's averments without any detailed explanation of how Rafael does not have personal knowledge about a family business in which he actively participated. El Matador also contends that Rafael's averments containing the words "would" or "believe" are speculative and not admissible. This is not a situation in which the declarant is speculating about someone else's actions or motives. *See Yancick v. Hanna Steel*

*Corp.,* 653 F.3d 532, 548 (7th Cir. 2011). Instead, Rafael made these statements based on his own experience while working with Carlos in the adobo spice business during the relevant time period. Therefore, the Court denies El Matador's motion to strike in this respect.

In addition, El Matador challenges Petra Rico's averments as conclusory and that her "statements leave more questions unanswered than answered." El Matador specifically takes issue with Petra's use of the term "believe" and that Petra stated that her father's butcher shop was called "El Matador" and "used" a logo of a man holding a cape, presumably because the word "use" has a defined meaning in trademark law. *See* 15 U.S.C. § 1127. Nevertheless, El Matador does not explain how Petra lacked any personal knowledge of her father's butcher shop and business while she lived in Mexico, that her brother Carlos moved to California where he worked at a butcher shop named El Matador, and other factual statements based on her involvement in the family spice business. El Matador also points to averments that have no relevance to any disputed material facts. *See Austin,* 240 F.R.D. at 422. Accordingly, El Matador has not established that the Court should strike Petra's statements from the record based on her lack of personal knowledge or their conclusory nature.

Last, El Matador maintains that the declarations – filed after the close of fact discovery – offer information that Purpecha failed to disclose during fact discovery. *See* Fed.R.Civ.P. 37(c)(1). El Matador specifically points to Purpecha's answer to an interrogatory asking for first use information, which stated that Purepecha first used the El Matador mark in May 1999 when Everardo Mejia placed labels containing that mark on buckets of spices. Because the interrogatory answer did not include Petra's first use in 1999, El Matador argues that Purepecha failed to disclose Petra's involvement in the business until after the close of discovery. Contrary

16

to El Matador's argument, from the beginning of this lawsuit Purpecha has repeatedly asserted

that Everardo and Petra worked together in their spice mix business since its inception in 1999.

(*See* Compl. ¶¶ 3, 27-33.)  In fact, El Matador cites Petra's deposition testimony in support of

their Local Rule 56.1 Statement ¶ 53 in which Petra explained that she and her husband,

Everardo, decided to start selling chorizo spice mix in Chicago and Cicero, Illinois in 1999.  (R.

78-3, EL M. Rule 56.1 Stmt. Facts, Ex A, Petra Dep., at 30.)  As such, El Matador's argument

that Purepecha did not disclose this information prior to the close of discovery is baseless.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P.

56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  In determining summary judgment

motions, "facts must be viewed in the light most favorable to the nonmoving party only if there

is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167

L.Ed.2d 686 (2007).  The party seeking summary judgment has the burden of establishing that

there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  After "a properly supported motion for summary

judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine

issue for trial.'"  *Anderson*, 477 U.S. at 255 (quotation omitted).  "[D]istrict courts presiding over

summary judgment proceedings may not weigh conflicting evidence or make credibility

determinations, both of which are the province of the jury."  *Omnicare, Inc. v. UnitedHealth*

17

*Grp., Inc.,* 629 F.3d 697, 704-05 (7th Cir. 2011) (internal citations omitted); *see also Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

## ANALYSIS

### I.     Lanham Act Infringement Claims

"Congress passed the Lanham Act in 1946 to 'federalize' existing common law protection of trademarks used in interstate commerce." *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 672-73 (7th Cir. 2001). "The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 198, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). To succeed in a trademark infringement action, a plaintiff must show that: (1) her mark is protectable; and (2) defendant's use of the trademark is likely to cause confusion among consumers. *See H-D Michigan, Inc. v. Top Quality Serv., Inc.,* 496 F.3d 755, 759 (7th Cir. 2007); *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 638 (7th Cir. 2001). "[F]ederal registration of a mark constitutes constructive nationwide use of the mark from the date of the application for registration." *WMS Gaming Inc. v. WPC Prods. Ltd.,* 542 F.3d 601, 603 (7th Cir. 2008); *see also* 15 U.S.C. § 1057(c). Nonetheless, in the absence of, or prior to, federal registration, whether a party has a protectable interest in a trademark is established by the first actual use of the mark in commerce. *See Central Mfg., Inc. v. Brett,* 492 F.3d 876, 881(7th Cir. 2007) ("it is not the fact of registration that matters so much as the use of the mark in commerce"); *see also Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.,* 188 F.3d 427, 434 (7th Cir. 1999) ("party who first appropriates the

18

mark through use, and for whom the mark serves as a designation of source, acquires superior rights to it").  As the Seventh Circuit teaches:

> By insisting that firms use marks to obtain rights in them, the law prevents entrepreneurs from reserving brand names in order to make their rivals' marketing more costly.  Public sales let others know that they should not invest resources to develop a mark similar to one already used in the trade.  Only active use allows consumers to associate a mark with particular goods and notifies other firms that the mark is so associated.

*Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir. 1992) (internal citations omitted).

Purpecha's federal registration of the El Matador and bullfighter marks creates a rebuttable presumption that Purpecha has a protectable interest in the marks under the Lanham Act as of the date of the application, March 16, 2009.  *See Central Mfg.,* 492 F.3d at 881.  The parties, however, hotly dispute whether Carlos was the first user of the marks or whether both Carlos and Rafael were the first users of the marks at issue.  In making a first use determination, the Court must look to the what constitutes "use in commerce" under the Lanham Act.  *See id.* at 882-83.  Section 1127 of Title 15 defines "use in commerce" as follows:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark.  For purposes of this chapter, a mark shall be deemed to be in use in commerce –
>
>> (1) on goods when –
>>
>>> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>>>
>>> (B) the goods are sold or transported in commerce.

15 U.S.C. § 1127.

Here, the parties dispute whether and when Carlos and Rafael used the marks on business materials, such as invoices, although the parties agree that the marks were used on the business cards at some point in 1996. There is a genuine dispute as to the material fact, however, whether Carlos was the first person to use the business cards with the marks identifying the chorizo adobo or whether Rafael used the business cards at the same time. (El M. Stmt. Facts ¶ 31; Rafael Rico Dep., at 145.)

In addition, although it is undisputed that Petra and Mejia did not use the marks until May 1999 – well after Carlos' and Rafael's first use – Purepecha maintains that Rafael assigned his rights in the El Matador and bullfighter marks to it through a back-dated November 2011 trademark license agreement and a January 2012 trademark license addendum. El Matador questions whether these agreements are valid in its response to Purpecha's Rule 56.1 Statement of Additional Facts, *see Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec,* 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts"), but offers little discussion about these agreements in its legal memorandum. Instead, El Matador contends that based on the back-dated license agreements and the suspicious timing of the agreements' discovery, these agreements embody nothing more than a "litigation-inspired, after-the-fact attempt to salvage some claim of ownership of rights in the Marks." (R. 93, El M. Reply Brief, at 5.) El Matador then asks the Court to disregard the agreements, but fails to give the Court sufficient reasons why – other than speculating that the agreements are a sham. In short, El Matador's argument concerns an issue of fact that the Court cannot determine at summary judgment. *See Yannacopoulos v. General Dynamics,* 652 F.3d 818, 831 (7th Cir. 2011) (speculation cannot be the basis for granting summary judgment).

Because there are genuine disputes as to the material facts underlying who was the first user of the El Matador and bullfighter marks and whether Rafael's and Purepecha's trademark license agreements are valid, neither El Matador nor Purepecha are entitled to judgment as a matter of law as to their Lanham Act trademark infringement claims. *See* Fed.R.Civ.P. 56(a). Also, because these genuine factual disputes exist, it is premature to consider the parties' arguments regarding concurrent use or whether either party is a good faith junior user. *See Money Store v. Harriscorp Fin., Inc.,* 689 F.2d 666, 674-75 (7th Cir. 1982). Therefore, the Court denies the parties' summary judgment motions as to their trademark infringement claims in Count I of Purepecha's Complaint and El Matador's Counterclaim I.[2]

## II.     Cancellation of Trademark Registrations

El Matador also seeks cancellation of Purepecha's El Matador and bullfighter trademark, U.S. Trademark Registration No. 3,942,992, and Purepecha's Matador Brothers trademark, U.S. Trademark Registration No. 3,436,830. Cancellation proceedings for both trademarks are pending at the Trademark Trial and Appeal Board. *See In the Matter of Registration,* Nos. 3942992; 3436830 (Cancellation No. 92054934).

Pursuant to 15 U.S.C. § 1119, federal courts may cancel registration of a trademark when warranted. *See TE-TA-MA Truth Foundation–Family of URI, Inc. v. World Church of Creator,* 297 F.3d 662, 665-66 (7th Cir. 2002) ("Trademark law does not reserve the cancellation power

---

[2] The Court did not address the parties' arguments made in footnotes or for the first time in their reply briefs. *See Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 571 (7th Cir. 2012) ("arguments raised for the first time in a reply brief are waived"); *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) (cursory arguments made in footnotes are waived). "The underlying concern is to ensure that the opposing party is not prejudiced by being denied sufficient notice to respond to an argument." *Hernandez v. Cook County Sheriff's Office,* 634 F.3d 906, 913 (7th Cir. 2011).

to the PTO"); 5 J. McCarthy, *McCarthy on Trademarks & Unfair Competition*, § 30:109 ("The net effect of § 37 is to give to the courts concurrent power with the Patent and Trademark Office to conduct cancellation proceedings.").  In particular, Section 1119 "arms the court with the power to update the federal trademark register to account for a mark's actual legal status (or lack thereof) after it has been adjudicated, thereby reducing the potential for future uncertainty over the rights in a particular mark." *Central Mfg., Inc.,* 492 F.3d at 883.  As the Seventh Circuit instructs, where "a registrant's asserted rights to a mark are shown to be invalid, cancellation is not merely appropriate, it is the best course." *Id.*  Nevertheless, "the power of the courts to cancel registrations and 'to otherwise rectify the register,' § 37, 15 U.S.C. § 1119, must be subject to the specific provisions concerning incontestability." *Park 'N Fly,* 469 U.S. at 203. More specifically, "[o]nce a mark has been used for five years following registration, it becomes 'incontestable,'" *see* 15 U.S.C. § 1065, and "[i]ncontestability is 'conclusive evidence of the validity of the registered mark and . . . the registrant's exclusive right' to use the mark in commerce." *Eco Mfg. LLC v. Honeywell Int'l, Inc.,* 357 F.3d 649, 651 (7th Cir. 2003) (quoting 15 U.S.C. § 1115(b)).

### A.    U.S. Trademark Registration No. 3,942,992

#### 1.    Cancellation Based on 15 U.S.C. § 1052(d)

In Counterclaim VI, El Matador seeks cancellation of Purepecha's El Matador and bullfighter trademark registration under 15 U.S.C. § 1052(d).  Purepecha's trademark registration has been in use for less than five years, and thus it is not "inconstestable." *See* 15 U.S.C. § 1065. Hence, the Court applies the same standards that are applied to the initial registration of a trademark to El Matador's claim seeking cancellation of Purepecha's trademark

registration. *See* 3 J. McCarthy, *McCarthy on Trademarks & Unfair Competition* § 20:52 (4th ed.) ("[F]or Principal Register marks not yet five years on the register, cancellation may be based on any ground in the Lanham Act that would have barred registration in the first instance.")

El Matador maintains that because Carlos was the first user of the marks, Purpecha does not have a protectable interest in the marks, and thus cancellation of U.S. Trademark Registration No. 3,942,992 for the El Matador and bullfighter design marks is appropriate under the circumstances. *See* 15 U.S.C. § 1052(d). As discussed, however, there are genuine disputes to the underlying material facts of first use. Because El Matador's argument is unavailing at this juncture, the Court denies El Matador's summary judgment motion as to Counterclaim VI.

### 2.    Cancellation Based on Fraud

Both parties move for summary judgment as to Counterclaim V in which El Matador seeks cancellation of U.S. Trademark Registration No. 3,942,992 based on fraudulent procurement of the trademark registration. *See* 15 U.S.C. § 1064(3). To establish that Purepecha engaged in fraud in procuring the registration of the El Matador and bullfighter marks, El Matador must establish by clear and convincing evidence that Purepecha deliberately attempted to mislead the PTO by presenting materially false and misleading information when Purepecha applied for its trademark registration. *See Money Store,* 689 F.2d at 670; *see also In re Bose Corp.,* 580 F.3d 1240, 1245 (Fed. Cir. 2009) ("a trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false, material representation with the intent to deceive the PTO."). "A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof." *In re Bose Corp.*, 580 F.3d at 1243.

23

In support of its argument, El Matador relies upon Purepecha's March 16, 2009 trademark application which affirmatively stated that "no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive." (El M. Add'l Facts ¶ 52.) El Matador also argues that there is evidence in the record that Petra and Mejia knew of Carlos' prior and first use of the marks before applying for the trademark registration.

Purepecha argues that Carlos and Rafael were the first users of the marks and that Rafael assigned his rights to Purepecha. For these reasons, Purepecha maintains that it has a protectable interest in the marks. Indeed, Purepecha has presented sufficient evidence creating a genuine dispute as to the material facts underlying this theory. Therefore, the Court would be hard-pressed to conclude that El Matador has established by clear and convincing evidence that Purepecha deliberately attempted to mislead the PTO by presenting materially false and misleading information when Purepecha applied for its trademark registration. *See Money Store,* 689 F.2d at 670. Put differently, viewing the facts and all reasonable inferences in Purepecha's favor, El Matador has not established Purepecha's deceptive intent with clear and convincing evidence. *See Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1366 (Fed. Cir. 2008) ("because direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence. But such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement.").

Last, there are genuine issues of material fact concerning Purepecha's naked licensing abandonment defense based on Purepecha's argument that Carlos relinquished control over the marks when he allowed his brothers Dario and Rogelio to use the marks in their businesses. *See Eva's Bridal Ltd. v. Halanick Enter., Inc.,* 639 F.3d 788, 789-90 (7th Cir. 2011) (naked licensing exists when mark owner allows "others to use the mark without exercising 'reasonable control over the nature and quality of the goods, services, or business on which the [mark] is used by the licensee'") (citation omitted). Specifically, the record contains genuinely disputed evidence that Carlos and his brother Rogelio made adobo together and that Rogelio assisted Carlos in his business, therefore, El Matador has raised genuine issues of fact that Carlos never relinquished any control over the marks as to Rogelio. (El M. Stmt. Facts ¶ 36.) Also, the parties genuinely dispute whether Carlos was involved with his brother Dario's spice business and Dario's use of the marks after 2001. (Purepecha Add'l Stmt. Facts ¶ 64.) Hence, Purepecha's argument that Carlos abandoned the marks via naked licensing is factually disputed.

For these reasons, the Court denies both Purepecha's and El Matador's summary judgment motions as to Counterclaim VI.

### B. U.S. Trademark Registration No. 3,436,830

In Counterclaim VII, El Matador seeks cancellation of U.S. Trademark Registration No. 3,436,830 for the mark "Matador Brothers" based on abandonment arguing that Purepecha has not sufficiently used the mark. "Because trademark rights derive from the use of a mark in commerce and not from mere registration of the mark, the owner of a mark will lose his exclusive rights if he fails actually to use it." *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 954-55 (7th Cir. 1992); *see also Zazu Designs,* 979 F.2d at 503 ("[o]nly active use

25

allows consumers to associate a mark with particular goods and notifies other firms that the mark is so associated."); *Specht v. Google,* 758 F.Supp.2d 570, 588 (N.D. Ill. 2010) (use of mark must be "deliberate and continuous, not sporadic, casual or transitory") (citation omitted). In its motion, El Matador specifically asserts that there is prima facie evidence of abandonment because Purepecha has not used the mark for three consecutive years. *See* 15 U.S.C. § 1127; *Zelinski v. Columbia 300, Inc.,* 335 F.3d 633, 639 (7th Cir. 2003).

Purepecha has owned the Matador Brothers mark since the date of the registration application, namely, November 8, 2006, and there are undisputed facts in the record that Purepecha first used the Matador Brothers mark in Texas in 2007. (El M. Stmt. Facts ¶ 59.) Moreover, there is a genuine dispute as to the material fact of whether Purepecha has used the Matador Brothers mark in Texas from 2007 until the present. (R. 78-5, Ex. C, Rafael Dep., at 180.) Due to this factual dispute, the Court denies Purepecha's and El Matador's summary judgment motions concerning the cancellation of U.S. Trademark Registration No. 3,436,830 based on abandonment.

El Matador also argues that the Court should cancel the Matador Brothers mark because it is confusingly similar to the El Matador mark. *See Herbko Int'l, Inc. v. Kappa Books, Inc.,* 308 F.3d 1156, 1164 (Fed. Cir. 2002) ("The PTO may refuse to register a trademark that so resembles a registered mark 'as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive'") (citing 15 U.S.C. § 1052(d)). El Matador's legal argument in support of this assertion is one sentence long and contains no citations to the record or pertinent legal authority except for a general citation to the statute. It is well settled in this Circuit that conclusory and underdeveloped arguments are waived. *See*

26

*Puffer v. Allstate,* 675 F.3d 709, 718 (7th Cir. 2012). Indeed, it is not the Court's role to research and construct this argument for El Matador, especially because El Matador's counsel are highly-skilled lawyers in the area of trademark litigation. *See Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996). The Court therefore denies both El Matador's and Purepecha's summary judgment motions as to the cancellation of U.S. Trademark Registration No. 3,436,830 as alleged in Counterclaim VII.

### III. ICFA and IUDTPA Claims

#### A. ICFA Claims

Both Purepecha and El Matador bring claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2. The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.,* 201 Ill.2d 403, 416, 266 Ill.Dec. 879, 775 N.E.2d 951 (Ill. 2002). Under the ICFA, a plaintiff must establish: "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 574 (7th Cir. 2012) (citation omitted). Moreover, the ICFA has no extraterritorial effect, such that only those acts that occur substantially and primarily within Illinois fall within the ICFA's purview. *See Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 185, 296 Ill.Dec. 448, 835 N.E.2d 801 (Ill. 2005); *see also LG Elec. U.S.A., Inc. v. Whirlpool Corp.,* 809 F.Supp.2d 857, 859 (N.D. Ill. 2011); *Chochorowski v. Home Depot U.S.A., Inc.,* 376 Ill.App.3d 167, 170, 314 Ill.Dec. 709, 875

N.E.2d 682 (5th Dist. 2007) ("Illinois Consumer Fraud and Deceptive Business Practices Act does not apply to fraudulent transactions that take place outside Illinois").

In its motion for partial summary judgment, Purepecha argues that El Matador cannot maintain its ICFA claim as alleged in Counterclaim IV because Purepecha's alleged actions underlying this claim did not occur substantially and primarily within the State of Illinois. *See LG Elec. USA,* 809 F.Supp.2d at 859; *Chochorowski,* 376 Ill.App.3d at 170. The undisputed facts in the record, however, show that Purepecha used the El Matador and bullfighter marks in the Chicago area in conjunction with selling chorizo adobo and that Purepecha used another name – El Gallo de Oro – to sell chorizo adobo in Arizona and California. Accordingly, there is a factual basis for El Matador's ICFA claim based on Purepecha's actions using the El Matador and bullfighter marks in Illinois. The parties, however, do not discuss the other elements of El Matador's ICFA claim in any detail, and thus the Court denies Purepecha's summary judgment motion as to Counterclaim IV.

Next, El Matador contends that because Purepecha's Lanham Act infringement claims fail, Purepecha cannot succeed on its ICFA claim against El Matador as alleged in Count VIII. *See Bob Creeden & Assoc., Ltd. v. Infosoft, Inc.,* 326 F.Supp.2d 876, 880 (N.D. Ill. 2004) ("In Illinois, courts resolve unfair competition and deceptive practices claims 'according to the principles set forth in the Lanham Act.'") (citation omitted); *MJ & Partners Rest. Ltd. P'ship v. Zadikoff,* 10 F.Supp.2d 922, 930 (N.D. Ill. 1998) (ICFA claim "must rise or fall based on the Lanham Act claim"). Because there is a genuine dispute as to the material fact of first use, this argument fails at this procedural posture. And, although El Matador raised other arguments in support of its summary judgment motion as to Purepecha's ICFA claim, El Matador made these

arguments for the first time in its reply brief, therefore, the Court considers them waived.  *See Wigod,* 673 F.3d at 571.

### B.    IUDTPA Claims

Similarly, both Purepecha and El Matador bring claims pursuant to the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), 815 ILCS 510/2.  The IUDTPA prohibits deceptive trade practices that occur primarily and substantially in Illinois.  *See LG Elec.,* 809 F.Supp.2d at 859; *Specht v. Google, Inc.,* 660 F.Supp.2d 858, 866 (N.D. Ill. 2009); *Super Wash, Inc. v. Sterling,* No. 04 C 4618, 2006 WL 533362, at *2 n.10 (N.D. Ill. Mar. 2, 2006).

Again, Purpecha argues that El Matador cannot maintain its IUDTPA claim as alleged in Counterclaim III because Purepecha's underlying conduct did not occur substantially and primarily in the State of Illinois.  *See LG Elec.,* 809 F.Supp.2d at 859.  As discussed above, the undisputed facts in the record establish that Purepecha used the El Matador and bullfighter marks in the Chicago area in conjunction with selling its chorizo adobo.  Therefore, Purepecha's use of the marks in Illinois can be the basis for El Matador's IUDTPA claim.  The parties, however, did not sufficiently discuss the other elements of El Matador's IUDTPA claim.  *See, e.g., Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA,* 384 Ill.App.3d 849, 866, 323 Ill.Dec. 507, 893 N.E.2d 981 (1st Dist. 2008).  The Court thus denies Purepecha's summary judgment motion as to Counterclaim III.

Next, El Matador asserts that because Purepecha's Lanham Act claims fail, it cannot succeed on its IUDTPA claim as alleged in Count IV.  *See Specht v. Google Inc.,* 758 F.Supp.2d 570, 596 (N.D. Ill. 2010) ("claim under the Illinois Deceptive Trade Practices Act [] fails," because "Illinois courts resolve these claims under the same standard as the Lanham Act."); *MJ*

*& Partners Rest.*, 10 F.Supp.2d 922, 930 (N.D. Ill. 1998) (IUDTPA claim "must rise or fall based on the Lanham Act claim"). Because there is a genuine factual dispute concerning first use, this argument is unavailing.

El Matador also argues that IUDTPA does not provide a cause of action for damages, therefore, Purepecha has no remedy because it did not plead or prove any basis for injunctive relief. Indeed, the IUDTPA does not provide a private cause of action for damages, but allows "private suits for injunctive relief and has generally been held to apply to situations where one competitor is harmed or may be harmed by the unfair trade practices of another." *Greenberg v. United Airlines,* 206 Ill.App.3d 40, 47, 150 Ill.Dec. 904, 563 N.E.2d 1031 (1st Dist. 1990); *see also Chicago's Pizza, Inc.,* 384 Ill.App.3d at 866.

Here, El Matador's bare-boned argument that Purepecha has failed to establish a basis for injunctive relief is belied by facts in the record creating a genuine dispute that certain Rico family members – other than Petra and Mejia – presently sell adobo and other products under the El Matador mark and bullfighter logo in the Chicago area. (Purepecha's Stmt. Add'l Facts ¶ 70.) The Court thereby denies El Matador's motion for summary judgment as to Count IV of the Complaint because Purepecha has presented evidence raising a genuine factual dispute supporting its claim for injunctive relief.

## IV.    Breach of Fiduciary Duty

In Counterclaim XI, El Matador alleges a breach of fiduciary duty claim against Mejia under Texas common law based on Carlos' and Mejia's 2005 agreement to form a business that would produce spice mixes for distribution throughout the United States. El Matador maintains that Mejia failed to fulfill the terms of the 2005 agreement, and thus Mejia breached his fiduciary

duty to the business. Under Texas law, the "elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Navigant Consulting, Inc. v. Wilkinson,* 508 F.3d 277, 283 (5th Cir. 2007) (citation omitted); *see also Godfrey v. Security Serv. Fed. Credit Union,* 356 S.W.3d 720, 727 (Tex. Ct. App. 2011).

El Matador specifically contends that Mejia breached his fiduciary duty because he did not provide funding for the warehouse on behalf of the proposed joint spice production business. As the undisputed facts reveal, however, Mejia attempted to secure a loan to contribute to the purchase of a warehouse by submitting a loan application, but the bank declined to give Mejia the loan. (Purepecha Stmt. Facts ¶ 36.) In short, Mejia's conduct in attempting to secure a loan does not establish that he placed his own interest above the interest of the joint spice production business. *See Lindley v. McKnight,* 349 S.W.3d 113, 124 (Tex. App. 2011) ("The effect of imposing a fiduciary duty is to require the fiduciary party to place someone else's interests above its own."). Also, because Mejia and Petra incorporated Purepecha in 2004, El Matador's argument that Mejia breached its duty to the joint spice business – a business that lasted approximately eight to fifteen days in 2005 – by competing through his own, established spice business is misplaced. (R. 78-4, Carlos Dep., at 116-17.) Finally, there is no evidence in the record that Mejia's actions caused El Matador harm. *See Meaux Surface Prot., Inc. v. Fogleman,* 607 F.3d 161, 170-71 (5th Cir. 2010); *see also Celotex Corp.*, 477 U.S. 322 (Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element

31

essential to that party's case, and on which that party will bear the burden of proof at trial").

Construing the evidence and all reasonable inferences in El Matador's favor, there are no

genuine issues of material fact concerning El Matador's fiduciary duty claim against Mejia. The

Court thus grants Purepecha's motion as to Counterclaim XI.

## V.     Defamation Claims

In Counterclaims IX and X, El Matador alleges claims of defamation *per se* and

defamation *per quod* based on Petra making disparaging comments about Carlos' products while

she was allegedly impersonating a health inspector.  Because it is undisputed that Petra's alleged

comments were made to Illinois retailers, the Court applies Illinois law to El Matador's

defamation claims because Illinois is the place of the wrongdoing, namely, where Petra allegedly

defamed Carlos.  *See Rice v. Nova Biomedical Corp.,* 38 F.3d 909, 916 (7th Cir. 1994); *see also*

*International Admin., Inc. v. Life Ins. Co. of N. Am.*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985) ("In

tort, Illinois – following the Restatement (Second) of Conflicts of Law – applies the law of the

state with the most significant relationship to the transaction at issue."); *Esser v. McIntyre,* 169

Ill.2d 292, 298, 214 Ill.Dec. 693, 661 N.E.2d 1138 (Ill. 1996) (following Restatement (Second)

of Conflict of Laws § 145).

Under Illinois law, "[d]efamation is the publication of a false statement that 'tends to

harm a person's reputation to the extent that it lowers that person in the eyes of the community

or deters others from associating with that person.'"  *Lott v. Levitt,* 556 F.3d 564, 568 (7th Cir.

2009) (citation omitted).  There are two types of defamation under Illinois law – defamation *per*

*se* and defamation *per quod*.  *See Giant Screen Sports v. Canadian Imperial Bank of Commerce,*

553 F.3d 527, 532 (7th Cir. 2009).  "Statements are considered defamatory *per quod* if the

defamatory character of the statement is not apparent on its face, and extrinsic facts are required to explain its defamatory meaning." *Kolegas v. Heftel Broad. Corp.*, 154 Ill.2d 1, 10, 180 Ill.Dec. 307, 607 N.E.2d 201 (Ill. 1992); *see also Madison v. Frazier,* 539 F.3d 646, 653 (7th Cir. 2008). "When a defamation claim is one for defamation *per quod*, [] a plaintiff must show special damages, i.e., actual damages of a pecuniary nature, to succeed." *Hukic v. Aurora Loan Serv.,* 588 F.3d 420, 438 (7th Cir. 2009). "Some statements, however, are so obviously harmful that injury to the plaintiff's reputation can be presumed and are considered actionable *per se.*" *See Lott,* 556 F.3d at 568. Illinois recognizes five categories of statements that are actionable *per se*, including "those that prejudice a party, or impute lack of ability, in his or her trade, profession or business." *Giant Screen Sports,* 553 F.3d at 532.

In its summary judgment motion, Purepecha first argues that El Matador's defamation claim does not qualify as defamation *per se*. Under Illinois law, however, Petra's alleged comments that El Matador's chorizo adobo was contaminated go directly to Carlos' and El Matador's lack of ability in their spice mix business. In other words, these comments – made to owners of retail stores in the Chicago area – were harmful to El Matador's and Carlos' reputations because El Matador and Carlos rely on their reputations to generate business. *See, e.g., Cartwright v. Cooney,* 788 F.Supp.2d 744, 754 (N.D. Ill. 2011).

Next, Purepecha argues that El Matador's defamation *per quod* claim fails because El Matador did not suffer actual damages. El Matador, however, has presented evidence raising a genuine dispute as to the material fact that after Petra made comments to certain grocers in Illinois, these grocers stopped purchasing the chorizo adobo from El Matador. (El M. Add'l Facts ¶¶ 50, 51.) In fact, there are other genuine disputes as to the material facts underlying El

33

Matador's defamation claims, including whether: (1) Petra falsely impersonated a government health inspector when she visited stores in the Chicago area; (2) Petra told the owner of a Mexican grocery store, namely, Abarrotes La Rosia, in Wheeling, Illinois, that Carlos' chorizo adobo contained salmonella; and (3) Petra told the owner of a store and butcher shop in Chicago called Supermercado La Villa that Carlos' adobo had chemicals in it and was contaminated. (*Id.* ¶¶ 61, 63, 66.) Therefore, the Court denies Purepecha's summary judgment motion as to El Matador's defamation claims as alleged in Counterclaim IX and X.

**VI.     Tortious Interference with Contract Claims**

Both Purepecha and El Matador bring Illinois common law claims for tortious interference with contract. To establish a tortious interference with contract claim under Illinois law, a plaintiff must show: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages." *Hess v. Kanoski & Assoc.,* 668 F.3d 446, 454 (7th Cir. 2012) (citation omitted).

**A.     El Matador's Tortious Interference with Contract Claims**

In Counterclaim XX, El Matador contends that it had a valid and enforceable contract with Abarrotes La Rosia, located at 1902 S. Wolf Road in Wheeling, Illinois, for the sale of El Matador chorizo adobo and that Purepecha tortiously interfered with this contract when Petra impersonated a health inspector and stated that El Matador chorizo adobo contained salmonella. In Counterclaim XXI, El Matador maintains that it had a valid and enforceable contract with Supermercado La Villa in Chicago and that Purepecha tortiously interfered with this contract

when Petra impersonated a government health inspector and stated that El Matador's chorizo adobo contained chemicals and was contaminated. Not only is there a genuine factual dispute whether Petra made any such comments in the first instance, El Matador has presented sufficient evidence creating a genuine dispute as to the material fact that Supermercado La Villa and Abarrotes La Rosia stopped buying chorizo adobo from El Matador after Petra made disparaging comments to the owners of these stores. Based on these disputed facts, the Court denies Purepecha's summary judgment motion as to Counterclaims XX and XXI.

In Counterclaims XII through XVI, El Matador alleges that Petra forced her niece, Yessica Orozco, to call store owners located in the Las Vegas area and impersonate a health inspector. According to El Matador, Orozco told certain stores in the Las Vegas area that El Matador's chorizo adobo was not up to health standards. Construing the facts and all reasonable inferences in El Matador's favor, El Matador has failed to present sufficient evidence raising a genuine dispute as to the material fact that these Las Vegas stores breached the relevant contracts and that El Matador was damaged – essential elements to these tortious interference with contract claims. *See Celotex,* 477 U.S. at 322; *see, e.g., Silverman v. Board of Educ. of City of Chicago,* 637 F.3d 729, 743 (7th Cir. 2011). The Court therefore grants Purepecha's summary judgment motion as to Counterclaims XII through XVI.

### B. Purepecha's Tortious Interference with Contract Claims

In Counts V, VI, and VII of its Complaint, Purepecha alleges that it had valid contracts with (1) a distributorship named Mi Constenita in Chicago, (2) Devon Supermarket in Chicago, and (3) Garden Fresh Market in Chicago and that Defendants Ruben Orozco and Carlos Rico tortiously interfered with these contracts. Purepecha, however, has failed to present any

evidence that Mi Constenita, Devon Supermarket, and Garden Fresh Market breached these contracts by not purchasing products from Purepecha based on Defendants' conduct or that Purepecha was damaged. Because Purepecha has failed to make a sufficient showing as to these elements of its tortious interference of contract claims, *see Celotex Corp.,* 477 U.S. 322, the Court grants El Matador's summary judgment motion as to Counts V, VI, and VII of the Complaint.

### CONCLUSION

The Court grants in part and denies in part Defendants'/Counter-Plaintiffs' motion for summary judgment and grants in part and denies in part Plaintiff's/Counter-Defendants' motion for partial summary judgment both brought pursuant to Federal Rule of Civil Procedure 56(a). The Court grants in part and denies in part Defendants'/Counter-Plaintiffs' motion to strike.

**Date:** August 24, 2012

ENTERED

**AMY J. ST EVE**
**United States District Court Judge**